*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KENNETH FLESHER,

        Plaintiff,

v

PROGRESSIVE MARATHON INSURANCE
COMPANY,

        Defendant-Appellant,

and

JOHN DOE, NICHOLAS FETZER, AUTO CLUB
INSURANCE ASSOCIATION, and
MEMBERSELECT INSURANCE COMPANY,

        Defendants-Appellees.

UNPUBLISHED
May 19, 2022

No. 357382
Genesee Circuit Court
LC No. 17-109372-NI

Before: LETICA, P.J., and MARKEY and O'BRIEN, JJ.

PER CURIAM.

        Defendant, Progressive Marathon Insurance Company (Progressive), appeals by right the trial court's order granting summary disposition in favor of defendants, Nicholas Fetzer, Auto Club Insurance Association, and MemberSelect Insurance Company, under MCR 2.116(C)(10).[1] The issue in this appeal is whether the trial court erred by determining that there was no genuine issue of material fact that Fetzer's GMC Yukon was not involved in an accident in which plaintiff, Kenneth Flesher, was struck by a hit-and-run vehicle while operating his motorcycle. Progressive

---

[1] MemberSelect Insurance Company is part of the Auto Club Insurance Association Group, and for purposes of this opinion and ease of reference, we shall refer to the two companies jointly as AC-MS.

-1-

was plaintiff's no-fault insurer, and AC-MS insured Fetzer's Yukon. We reverse and remand for further proceedings.

## I. BACKGROUND

On July 4, 2016, at approximately 11:30 p.m. in the city of Flint, plaintiff was operating his motorcycle in a northbound lane of traffic when a motor vehicle traveling southbound crossed the centerline in an apparent attempt to make a left turn in front of the motorcycle, resulting in a collision.[2] The traffic crash report indicated that the motor vehicle then "fled the scene" and that plaintiff "was transported to the hospital for his injuries." The crash report revealed that the motorcycle sustained disabling damage caused by the hit-and-run accident. The responding police officer also noted in the crash report that the motor vehicle was described as a white Ford pickup truck, that the truck sustained functional damage, and that the "[c]rash [t]ype" was "[h]ead on." A 911 event chronology based on call comments provided that the white pickup truck had a topper and that the truck "should have d[a]rk blue or purple paint from the motorcycle / right front end & right pass[enger] side damage."[3]

In the deposition of Officer Sean Coe, who was employed by the Flint Police Department at the time of the accident and prepared the traffic crash report, he could not recall where or from whom he obtained the information that the hit-and-run vehicle was a white Ford pickup truck. Officer Coe had no independent recollection of the accident and had to rely on his crash report while being deposed. He could not provide any testimony outside the four corners of the crash report regarding the nature of the impact between the motor vehicle and the motorcycle and the extent of the damages.

An EMS ambulance report set forth a narrative concerning the dispatch and response to the accident scene. The report stated that the motorcycle had extensive front-end damage, that plaintiff was alert and oriented, and that bystanders indicated that plaintiff had at first lost consciousness. Plaintiff informed EMS personnel that he had been traveling down the road at about 30 to 40 mph when a vehicle turned in front of him and that plaintiff then struck the front of the vehicle, causing him to hit the curb with his motorcycle and flip over the cycle's handlebars. On July 5, 2016, a police reporter for MLive published an article in the Flint Journal regarding the accident. This was part of a police effort to identify the hit-and-run driver. The article indicated that "[t]he motorcyclist hit a white pickup truck with a white topper that was traveling southbound . . . ." The article further provided that the "[p]reliminary investigation reveal[ed] [that] the truck made a left hand turn in front of the motorcycle and proceeded eastbound[.]"

Danielle Flesher is plaintiff's sister; she became an integral part of the case. In her deposition, Danielle testified that she spoke to her brother in the hospital and that he indicated "that it was a truck" that struck him, but he did not know who was driving the truck. Danielle stated that she was on Facebook after seeing plaintiff in the hospital and discovered that the local police department had a "blotter" that referenced the accident. Danielle testified that three individuals, two women and a man, posted comments in relation to the accident mentioned on the Facebook police blotter and that she privately messaged those persons about the accident over the

---

[2] The record reflected that the roadway had two lanes of travel.

[3] The quoted language is in all caps in the original 911 event chronology.

next day or so. They informed Danielle that they were in the neighborhood where the accident occurred and had witnessed the accident or the immediate aftermath of the crash. Although they could not identify the driver of the hit-and-run motor vehicle, they described the vehicle as being either a white truck with a topper or a white SUV-type of vehicle. Danielle believed that all three individuals had spoken to the police at the accident scene. Danielle claimed that they were of the opinion that the front driver's side of the motor vehicle had struck the motorcycle.[4] None of the individuals indicated to Danielle that the rear window of the vehicle was smashed, broken, or missing.[5]

On July 5, 2016, Danielle headed to plaintiff's house to let his dog out. As she neared the home, Danielle passed a street which was close to the accident scene and noticed a white vehicle parked on the side of the street that she thought might perhaps be the hit-and-run vehicle. There is no dispute that the vehicle, a white 2004 GMC Yukon Denali XL, was owned by Fetzer at the time of the accident. Danielle testified that she circled back, drove down the street, and parked away from the Yukon. She then walked up to the Yukon and examined it, taking photographs of the vehicle. Danielle claimed that the Yukon "had blue paint and damage to the front and to the side and the rear[.]" She testified that her brother's motorcycle was blue. Danielle asserted that there was "intense damage . . . with blue paint." When asked what she meant by "intense damage," Danielle explained that the Yukon had "[p]retty big dents and scrapes to the side" and that "[y]ou could tell that it had hit something."[6] She also testified that there were "different marks going

---

[4] We note that there are no police statements in the record directly or specifically attributed to the three individuals, and they did not execute affidavits as part of the litigation. There is also no indication in the record that any one of them was deposed.

[5] The relevancy of this testimony will become clear later in this opinion.

[6] The photographs in the record, taken by Danielle, revealed scuffmarks on the rounded corner of the front bumper on the driver's side of the Yukon. The scuffmarks appeared to be black in color, but the quality of the photographs make it difficult to definitively identify the scuffmarks as being solely black. Indeed, one of the photographs of the scuffmarks seemed to show some blue markings. We also note that the record contained some Facebook messages between Danielle and one of the women who had posted comments to the police-blotter reference to the accident. Danielle sent her a photograph of Fetzer's Yukon and asked her if it was the vehicle involved in the accident. While not entirely clear because of the fractured nature of the messaging, it appears that the woman answered in the affirmative. At the summary disposition hearing, Progressive's counsel mentioned the communications between Danielle and the woman:

> However, [Danielle] provided sworn deposition testimony recounting how she found that person, indicating that that person was listed on a Facebook group who allegedly witnessed the accident. She reached out to that person, they communicated, and she sent a photo of the vehicle that she took on . . . July 5, who then as noted in the plaintiff's response, identified that vehicle as being the vehicle involved.

AC-MS vigorously argued that the evidence could not be considered because it constituted hearsay and because there were numerous foundational shortcomings. Because of potential hearsay issues and the fact that the woman never executed an affidavit or was deposed, we decline to consider

-3-

from the front end of the vehicle" and that the rear window of the Yukon was either damaged or missing.[7]  Upon her discovery and observations, Danielle called 911.

According to Danielle, she returned to her parked car, but before she left the area, she saw Fetzer, whom she did not know at the time, walk up to and enter the Yukon.  Danielle then pulled up next to the Yukon, such that the vehicles were side-by-side, and lowered her passenger-side window, catching Fetzer's attention.  With both persons remaining in their vehicles, they carried on a short conversation.  Danielle testified that she asked Fetzer whether he had been in an accident the previous night, and he denied any involvement in an accident.  Danielle asserted that Fetzer at first stated that he had attended a fireworks show in Frankenmuth on the Fourth of July, but he then claimed that it was a fireworks show in Bay City, which is about one hour away.[8]  Danielle testified that she asked Fetzer about the cause of the damage to his vehicle and that he responded that it was none of her business.  When she told him that she had contacted the police, Fetzer put the Yukon in reverse and backed all the way down the street and fled, inferentially suggesting that he was trying to prevent Danielle from seeing his license plate number.

Danielle noticed that three individuals came out of the home where Fetzer had been before he walked to his parked Yukon.  On Danielle's inquiry, the individuals, who were on the porch of the house, denied knowing Fetzer.  She once again parked down the street from where the Yukon had been sitting, waiting for the police to arrive while the three individuals stared at her from a distance, which made her uncomfortable.  After about 15 to 20 minutes, Danielle again called 911, informing the operator that Fetzer had driven away.  The 911 operator recommended that she leave the area because the police would not respond to the location now that Fetzer was gone.  The operator suggested that Danielle contact the detective assigned to the accident investigation.  Danielle testified that later that day, July 5th, she sent the photographs of the Yukon to the assigned detective by e-mail, and he indicated that he would investigate the matter and that it was likely that Fetzer was already taking steps to repair or hide the damage.  Danielle's testimony seemed to indicate that the detective was not pleased that she had approached Fetzer because Fetzer now knew he would eventually be questioned, thereby giving him the opportunity to cover up the damage in the meantime.

Plaintiff, who was hospitalized for over a month, testified at his deposition that the hit-and-run vehicle initially veered into his lane of travel, appearing as if it was going to make a turn, which caused plaintiff to take evasive action.  Plaintiff explained that the motor vehicle then returned to its own lane and that plaintiff responded by straightening his path of travel.  But, according to plaintiff, the motor vehicle then once again veered into his lane of travel and the

---

the alleged Facebook assertions of the woman or of the other two persons who conversed with Danielle on-line.

[7] Danielle, who had also gone to the accident scene, testified that there was some glass remaining at the scene, but she acknowledged that she had no idea whether the glass was from the Yukon.

[8] We take judicial notice that Frankenmuth is approximately a 30-minute drive from Flint.  See MRE 201.

collision occurred.[9]  Plaintiff testified that the vehicle struck the back end of his motorcycle.  He described his motorcycle as being painted blue.  Plaintiff additionally testified as follows:

> *Q.* What do you remember about that vehicle in terms of its make, model, color, anything like that?
>
> *A.* It was a white, more - - I'd say more like a box vehicle, like a Yukon or a truck of some sort, white, older.
>
> *Q.* The police report in this case identifies the vehicle as a Ford pickup truck. Are you saying that your recollection is it's not a pickup? It was more of a sport utility vehicle?
>
> *A.* I didn't really get to see the back. I mean, it could have been. I'm not 100 percent. I know the lady I met, she said it was a truck as well. I just know that I seen it was white, and the front end of it I know was for sure a truck. I just don't know if it was a Yukon or what. I just kind of assumed it was. It kind of seemed big.
>
> *Q.* Are you pretty sure it was a Ford?
>
> *A.* It was dark and kind of - - didn't really get to see much of it. It was just like a quick flash of - -
>
> *Q.* Are you pretty sure it was a Ford?
>
> *A.* I didn't really get to see the make or anything like that. I'm not sure on that.
>
> *Q.* Safe to say you are comfortable in testifying that the front end of that vehicle struck the rear tire of your motorcycle?
>
> *A.* Not like just the tire but like the rear end of the bike, yes.
>
> *Q.* But it was the front of that vehicle that struck you?
>
> *A.* Yes.
>
> *Q.* All right. Was it the front driver's side? Was it the middle, or don't you really recall?

---

[9] Plaintiff testified:

> Because he originally - - yes, he was going - - it looked like he was going to turn left down that road, but then he straightened out. And then once I got to him, he just veered over onto me like super close. In fact, there's still today a tire print up over the curb where he went over the curb right where I was at.

*A.* I would probably say it was more the driver's side. Definitely wasn't the passenger's side. It would either have been the middle or more the driver's side that hit me.

During the deposition, plaintiff was presented with photographs of Fetzer's Yukon taken by his sister. When asked to describe the damage to the front of the Yukon seen in one of the photographs, plaintiff responded, "It was a little dented and had blue paint like scuffed on it. You could tell it was like pretty fresh-looking paint." Plaintiff opined that it was the same shade of blue as his motorcycle. Plaintiff later agreed that it was "[t]he front driver's-side corner of the car" that hit his motorcycle.

Fetzer was deposed and was combative and evasive at times during the deposition, which spanned two days after he insisted upon leaving following one hour of testimony on the first day because, allegedly, he had to get to work or risk being fired. Fetzer testified that he had owned a 2004 GMC Yukon Denali XL at the time of the accident. Fetzer claimed that on July 4, 2016, he had driven up to Bay City in the Yukon to watch the city's fireworks show, which was something that he did every year. He testified that he left Flint for the fireworks show at around 11:00 a.m. or 11:30 a.m. and arrived in Bay City at approximately 4:00 p.m. or 5:00 p.m.[10] Fetzer emphasized, "I know I was in Bay City" when the accident occurred. He stated that no one had accompanied him when he drove to and from the fireworks show, but he did indicate that he probably met with a few friends at the show, although he could not identify anyone by name.

Fetzer testified that he got stuck in traffic upon leaving Bay City and did not arrive back in Flint until approximately 12:30 a.m. or 1:00 a.m. on July 5, 2016. Fetzer was confronted with undisputed evidence that July 4, 2016, fell on a Monday, and there was also evidence of a city news release showing that the 2016 Bay City main fireworks show was held on Saturday, July 2, 2016, with a fireworks teaser show being performed on Friday, July 1, 2016. There were holiday events scheduled by Bay City during the week leading up to those weekend shows, but nothing was planned for July 4, 2016. Fetzer, however, was adamant that he witnessed a fireworks show in Bay City on July 4, 2016.[11] He did finally proclaim, "My memory might not be all the way 100 percent of two years ago, but I know that I was not in Flint when this [accident] had happened."

According to Fetzer, once he was back in Flint and about five blocks away from home, there was an attempted robbery made against him. And the perpetrator shot at him from behind while Fetzer was in the Yukon, resulting in the rear window being shattered and a bullet nearly striking him in the head as it passed through the front windshield. Fetzer claimed that there were state troopers nearby outside a store and that he quickly alerted them of the robbery attempt. Fetzer asserted that the officers immediately went in pursuit of the alleged armed robber in the direction given to them by Fetzer, leaving Fetzer behind by himself. Fetzer then decided to go home. He testified that the police never took a statement from him regarding the attempted robbery and

---

[10] Fetzer acknowledged that Bay City was about a one-hour drive from Flint.

[11] After being confronted with the information, Fetzer suggested that it was perhaps a small, private fireworks display that he had witnessed, but he had previously indicated that it was about a 30-minute show, which was consistent with Bay City's main fireworks show. He had also repeatedly referenced the event as the fireworks show conducted by "Bay City."

shooting and never followed up with him on the matter. Fetzer also maintained that he never followed up with the police regarding the incident, nor did he make an insurance claim relative to the gunshot damage to the Yukon.

Fetzer testified that he only owned the 2004 GMC Yukon for two or three months before it was repossessed a few days after the date of the accident. He contended that he had purchased the Yukon from Champion Auto Sales, putting down $1,000. A certificate of title revealed that Champion Unlimited, Inc., transferred title to the Yukon to Fetzer on May 26, 2016. And a certificate of repossession reflected that Champion repossessed the Yukon on July 22, 2016. Fetzer testified that he wanted the Yukon to be repossessed and that he intentionally stopped making the $400 monthly payments. He explained, "I found out that there was, like, 25 percent interest, I would have been paying triple what the truck was worth so I let them have it back." Plaintiff and Progressive later argued that Fetzer's intentional actions in allowing repossession constituted spoliation of evidence.

Fetzer testified that when he purchased the Yukon, it had an existing "little scrape on the front bumper." He later described the existing damage as a mark, scratch, or chip about the size of a quarter that was located on the front bumper on the driver's side of the vehicle. Fetzer maintained that there were no "paint" scrapes on the Yukon on July 4th and 5th, 2016.[12] Fetzer was adamant that he was never in an accident involving the Yukon.[13]

Fetzer acknowledged the confrontation with Danielle on July 5, 2016, as the two sat in their vehicles. He testified that they spoke for about three minutes, that he denied being in any accident, that he was in the area doing work on a deck,[14] and that when he left, he simply pulled forward and did not back up and flee as claimed by Danielle. Fetzer did confirm that the photographs taken by Danielle were of his GMC Yukon. When he was asked about the photographs showing scuffmarks on the driver's side of the front bumper, Fetzer first noted that the quarter-size chip or scratch damage referenced earlier was separate from the scuffmarks. As to the scuffmarks, Fetzer's testimony was not very clear. At first, he stated that he did not recall the scuffmarks being present, but then he asserted that the scuffmarks had always been there, although not to the extent seen in the photographs. Fetzer next suggested that the photographs may have been photoshopped, with the scuffmarks being added in. We note that there was no evidence that the photographs had been photoshopped.

Counsel attempted to acquire cell phone information from Fetzer in an apparent effort to obtain tracking information. Fetzer, however, testified that he did not remember what kind or type of phone that he had on July 4, 2016, that he generally went through five phones per year, that he could not recall his cellular service provider at the time, that he had used multiple providers over the years, that he did not remember his phone number at the time of the accident, and that he

---

[12] Fetzer was ostensibly speaking of paint-transference marks on the vehicle.

[13] Fetzer indicated that he was the only person who drove the Yukon during his period of ownership.

[14] Fetzer testified that he worked as a carpenter and had a remodeling business at one time.

usually used phones with prepaid minutes.[15]  Fetzer testified that he has seven children, including one child with a girlfriend with whom he had an on-again, off-again relationship around the time of the accident.  He could not recall whether the girlfriend was living with him on July 4, 2016, even though he initially stated that she was residing with him.  Fetzer indicated that he was currently in a custody or visitation dispute with this former girlfriend.  Although she was identified by name, he at first refused to disclose her address because he did not want to involve her in the matter.  Fetzer then claimed that he simply did not know her address.  Fetzer contended that she was currently staying with a cousin, but he did not know the cousin's address.  He also asserted that he did not know the former girlfriend's or her cousin's phone number.

In March 2017, a field investigation conducted by AC-MS revealed attempts to locate witnesses to the crash who lived near the accident scene.  The investigation report reflected that the investigator was unable to locate and speak to anyone who personally witnessed the accident or the damage done to the hit-and-run vehicle.  The investigator did speak to an individual who claimed that a neighbor "was outside in the front yard when the crash happened and . . . saw the whole thing."  She directed the investigator to a particular address where the neighbor resided.  But when the investigator went to the home, where two vehicles were parked in the driveway, "the people inside declined to answer . . . [his] efforts at contacting them."  He encountered similar responses at other homes.  There is no indication in the record that the alleged eyewitness referenced in the report ever provided a description of the accident or of the damages sustained by the white vehicle.

In June 2017, upon request by AC-MS, Crash Services, Inc., prepared a report following a vehicle-damage and crash-data analysis relative to the accident.  The accident reconstructionist who authored the report reviewed documents and photographs connected to the accident, including pictures of the motorcycle and Fetzer's GMC Yukon, and he examined the accident scene.[16]  With respect to the Yukon, the reconstructionist stated:

> The first photo of the GMC Yukon shows contact damage located on the left end of the front bumper cover and was in the form of scuffmarks that were black in color. These marks appear to travel in a front to rear direction and end at the edge of the cover next to the wheel well. There was no damage to the left headlight fixture, grill, left fender or hood.

---

[15] Throughout his deposition, Fetzer complained that he was being asked about events that occurred two years earlier, which was why he had trouble remembering any specifics.  We also note that evidence was presented showing that Fetzer had a past conviction for operating a drug house.  There was no evidence that Fetzer was ever criminally charged in connection with the hit-and-run accident.

[16] The accident reconstructionist went to the home of the current owner of the motorcycle, but no one would answer the door.  The reconstructionist did not indicate whether efforts were made to locate the Yukon, and he relied solely on existing photographs to assess and evaluate the damage to that vehicle.

A second photo of the Yukon shows the left side and rear of the vehicle. There was no damage to the left fender, doors, rocker panel, quarter panel or rear end. The rear window appeared to have been removed.

The accident reconstructionist for Crash Services, Inc., came to the following conclusion and opinion:

The damage on the Yamaha [motorcycle] was not consistent with having been created by contact with the GMC Yukon. Damage on the Yamaha was extensive and included broken plastic, a twisted and bent fork, abrasion marks and embedded dirt and grass. This damage corresponded with information in the police report that the Yamaha collided with the front end of a vehicle.

The damage on the GMC Yukon was slight in severity and in the form of scuffmarks on the plastic bumper cover. There was no damage on the Yukon that was consistent with the type of extensive crush present on the Yamaha.

Based on the information available, it is concluded that the Yamaha motorcycle was involved in a head-on collision with a vehicle other than the GMC Yukon.

In an affidavit executed by a senior claims investigator for AC-MS, she offered the following averment:

That after conducting [a] thorough investigation, I concluded there was no credible evidence that the Yukon owned by Nicholas Fetzer and insured by the Auto Club/MemberSelect at the time of the loss, was involved in this loss. The description of the hit and run vehicle seen by witnesses does not match the model and make of the Yukon. The black scuff marks do not match the color of Plaintiff's blue motorcycle. . . . .[17]

A claims specialist for AC-MS averred in her affidavit that plaintiff's claim for personal protection insurance (PIP) benefits was denied on the basis of AC-MS's "investigation which revealed there was insufficient evidence of coverage since there was no credible evidence to establish that the vehicle owned by Nicholas Fetzer and insured by [AC-MS] was involved in the 7/4/16 loss."

Plaintiff filed a complaint in the trial court, naming as defendants John Doe, Fetzer, Progressive, and AC-MS. John Doe was evidently named as a defendant in case it was determined that the Yukon and Fetzer were not involved in the accident. Plaintiff alleged counts of negligence against Doe and Fetzer, asserting that he suffered a serious impairment of body function and

---

[17] In an e-mail from an AC-MS claims investigator to the senior claims investigator, he noted that he "saw two very minor imperfections or scratches on the LF bumper" of the Yukon and that the "[f]inish was a little ruff, and could have been repainted." The e-mail referred to the names of a couple who evidently now owned the Yukon, and there were attached photographs of the Yukon absent the scuffmarks, which clearly had been repaired by that point.

serious permanent disfigurement as a result of the accident. In addition, plaintiff alleged a first-party claim for PIP benefits against Progressive. And plaintiff set forth a similar claim against AC-MS, setting the stage for a PIP-benefit priority dispute between the insurers.

Subsequently, AC-MS and Fetzer moved for summary disposition under MCR 2.116(C)(10). They contended that because there simply was no evidence and only pure speculation placing the Yukon at the scene of the accident, reasonable minds would not differ in concluding that the Yukon was not involved in the accident. And because there was no genuine issue of material fact on the matter, AC-MS and Fetzer were entitled to have the claims against them summarily dismissed. Progressive and plaintiff separately responded, citing Danielle's testimony and alleging numerous inconsistencies in Fetzer's claims regarding his whereabouts on July 4, 2016, the repossession of the Yukon, and in regard to the damages to the Yukon. They maintained that the trial court was not permitted to assess Fetzer's credibility—relative to his repeated denials of involvement in the accident—for purposes of the motion for summary disposition. Progressive and plaintiff argued that on viewing the evidence in a light most favorable to them, the court had no choice but to deny the motion for summary disposition. Fetzer and AC-MS replied that Danielle's assertions were speculative, that Fetzer's alleged inconsistencies merely reflected a lack of memory concerning long-ago events, and that Progressive and plaintiff chose to simply ignore the field-investigation evidence.

The trial court granted the motion for summary disposition in a ruling from the bench. The court reasoned and explained:

Here, the evidence that's being presented by the defendant [Fetzer] strongly implies that neither he nor his vehicle were involved in the accident. That is the most troubling part for this Court. I don't know cars, but I know the difference between a truck with a topper and a Yukon. But my personal experience is not at issue here. Here we have police reports, we've got deposition testimony and other admissible evidence that strongly implies that the vehicle involved in the accident was a Ford pickup truck with a topper rather than this GMC Yukon.

Additionally, the accident reconstruction report, the Court will accept yes, it's hearsay. I disagree that the levels of hearsay are the same compared to . . . [Danielle], what she's bringing in, but it doesn't matter about levels. It's all hearsay. But having said that, we have an accident reconstruction . . . report based on testimony and based on the police reports, that Mr. Fetzer's Yukon is inconsistent - - that the damage to his Yukon was inconsistent with the expected damage that the vehicle involved in this crash would [have].

And then what we have from Mr. Flesher and Progressive, it's based on allegations and conjecture without much evidentiary support. Mr. Flesher and Progressive would have this Court rely on the ID of Danielle Flesher who was not at the scene of the accident. She conducted her own investigation. Her ID appears to have been based mostly on a Facebook conversation. Now, it has been discussed today that she toured the neighborhood and saw this vehicle, but again, she did not witness the accident. [S]he was not an eyewitness. The eyewitness, let's see, according to this Court's review, she lived in Waterford, she was not living in the

-10-

proximity of the accident. I don't know if that was ever fleshed out. How did she, you know, how did she witness the accident?

There is a lot of discussion and I'm accepting it. Mr. Fetzer may be a liar, he had a criminal background, but . . . it is not this Court's view that it is his burden to provide alibi. It's up to the plaintiff to bring something in response to this summary disposition motion that would create a material issue of genuine fact.

The photograph that was attached to the motions and the response, . . . he can't provide a definitive explanation as to how that damage came to that vehicle, but again, I don't think that would be a sufficient basis for a denial of this motion. And therefore, the Court is granting the motion.

Subsequently, in April 2019, the trial court memorialized its ruling in an order granting the motion for summary disposition for the reasons given by the court on the record at the hearing.[18]

The lawsuit by plaintiff against Progressive remained pending for the next two years. Finally, in May 2021, a stipulated order was entered pursuant to which plaintiff's claim against Progressive for no-fault benefits was dismissed with prejudice. The order indicated that plaintiff and Progressive agreed that the stipulation could not be construed as impeding Progressive's ability to litigate whether AC-MS had higher priority to pay benefits on the basis that the Yukon was involved in the accident. The order provided that it was a final order, resolving the last pending claim and closing the case. Progressive now appeals by right.

## II. ANALYSIS

On appeal, Progressive argues that the trial court erred by granting the motion for summary disposition, where Progressive submitted substantively admissible evidence that Fetzer's GMC Yukon was involved in the accident on July 4, 2016, and where the court improperly made credibility determinations and weighed the evidence. AC-MS contends that the trial court did not err by granting the summary disposition motion because plaintiff and Progressive failed to provide any affirmative, competent evidence and otherwise failed to establish beyond sheer speculation that Fetzer's Yukon was involved in the hit-and-run accident.

---

[18] We note that MemberSelect filed a separate action that also arose from the accident, which ultimately resulted in an appeal to this Court. See *MemberSelect Ins Co v Flesher*, 332 Mich App 216, 219; 956 NW2d 535 (2020). Fetzer owned the Yukon but his mother was identified under the insurance policy "as the principal named insured[.]" *Id.* MemberSelect brought suit for declaratory relief, requesting a determination that Fetzer's mother "had no insurable interest in the Yukon and that the policy covering it was therefore void." *Id.* "The trial court consolidated the two cases . . . ." *Id.* MemberSelect brought a motion for summary disposition in its action, and the trial court held a hearing on the motion, during which the court also entertained the motion for summary disposition filed in the instant suit. *Id.* at 220. The trial court first granted the summary disposition motion filed in our case. *Id.* The court then proceeded to deny MemberSelect's motion for summary disposition, concluding that Fetzer's mother "had an insurable interest." *Id.* This Court affirmed the trial court's ruling. *Id.* at 231.

## A. STANDARD OF REVIEW

We review de novo a trial court's ruling on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019).

## B. SUMMARY DISPOSITION PRINCIPLES UNDER MCR 2.116(C)(10)

MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013). "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on subrule (C)(10)," MCR 2.116(G)(3)(b), and such evidence, along with the pleadings, must be considered by the court when ruling on the (C)(10) motion, MCR 2.116(G)(5). "When a motion under subrule (C)(10) is made and supported . . ., an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4).

"A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact." *Pioneer State*, 301 Mich App at 377. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). *Pioneer State*, 301 Mich App at 377. "Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Skinner v Square D Co*, 445 Mich 153, 162; 516 NW2d 475 (1994). "[S]peculation is insufficient to create an issue of fact." *MEEMIC Ins Co v DTE Energy Co*, 292 Mich App 278, 282; 807 NW2d 407 (2011). A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion. *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999); see also MCR 2.116(G)(6).

## C. DISCUSSION AND RESOLUTION

A motorcyclist involved in an accident that arises out of the ownership, operation, maintenance, or use of a motor vehicle is entitled to recover no-fault benefits. *Detroit Med Ctr v Progressive Mich Ins Co*, 302 Mich App 392, 395; 838 NW2d 910 (2013). The motor vehicle need not be the proximate cause of an injury, but there nevertheless must be a causal connection between the sustained injury and the ownership, maintenance, or use of the vehicle. *Id.* In this case, upon our review of the documentary evidence in a light most favorable to Progressive and making all legitimate inferences in favor of Progressive, we hold that there exists a genuine issue of material fact regarding whether Fetzer's GMC Yukon struck plaintiff's motorcycle on July 4, 2016, and caused plaintiff's injuries.

We begin with a discussion of Fetzer's deposition testimony. It is certainly true that this panel cannot assess Fetzer's credibility and find that he was either being truthful or lying when testifying. We can, however, make a determination in any given case that reasonable jurors could conclude based on the evidence that a party or person was not being truthful, and thus the trier of fact must be allowed to assess credibility. See *White v Taylor Distrib Co, Inc*, 482 Mich 136, 142-143; 753 NW2d 591 (2008) (under the legal and factual circumstances of a case, we do not ignore inconsistencies in statements by parties, which are properly left for a jury to address and resolve). Here, in light of the evasiveness of Fetzer's deposition testimony, the inconsistencies between his testimony and other evidence, the inconsistencies within his own deposition, the questionability of some of his claims, and the lack of sound explanations on pertinent issues, we find that a reasonable juror could reach the conclusion that Fetzer was being less than truthful in his deposition. More specifically, the evidence that Bay City did not have a fireworks show on July 4, 2016, if true, calls into question Fetzer's alibi and his whereabouts at the time of the accident. Furthermore, Fetzer's claims regarding the purported attempted robbery and shooting that shattered the rear window of the Yukon were highly suspicious because they require one to believe that the police did not ask him to remain at the scene, did not ask him to provide a statement, and did not follow up on a very serious crime. Additionally, Fetzer did not appear to provide any real explanation regarding the presence of the scuffmarks on the driver's side front bumper, other than resorting to a claim that the photographs may have been photoshopped. Moreover, there was Fetzer's testimony with respect to the address and phone number of his former girlfriend and his cell phone usage, which could reasonably be construed as evasive.

AC-MS argues that Fetzer's testimony and its inconsistencies merely demonstrated a lack of recall or memory of events that occurred two years earlier, which was understandable given the passage of time. AC-MS may indeed be correct, but it is for a jury to ascertain whether Fetzer's testimony reflected innocent memory lapses or intentional fabrications. Also, accepting Danielle's testimony as true, Fetzer's claim about attending the Bay City fireworks show was made the day after he supposedly attended the fireworks. And memory issues were unlikely entangled with matters regarding the alleged shooting that almost killed Fetzer and shattered the Yukon's window.

Our Supreme Court has observed "that where the truth of a material factual assertion of a movant's affidavit depends on the affiant's credibility, there inheres a genuine issue to be decided at a trial by the trier of fact and a motion for summary judgment cannot be granted." *Brown v Pointer*, 390 Mich 346, 354; 212 NW2d 201 (1973). And this Court has similarly stated that "where the truth of a material factual assertion of a moving party depends upon a deponent's credibility, there exists a genuine issue for the trier of fact and a motion for summary disposition should not be granted." *Vanguard Ins Co v Bolt*, 204 Mich App 271, 276; 514 NW2d 525 (1994). Fetzer factually asserted that he was not involved in the accident, which was certainly material, but Fetzer and AC-MS also relied on other evidence in support of their motion for summary disposition. And we shall proceed with our analysis by examining more of the documentary evidence.

With respect to Danielle's interaction with Fetzer on July 5, 2016, her deposition testimony, which we accept as true for purposes of the (C)(10) motion, revealed behavior by Fetzer from which it could reasonably be inferred that he had been involved in the accident. Although he denied that the Yukon had struck plaintiff's motorcycle, he did not answer Danielle's question about the cause of the damage to his vehicle. And he backed up the Yukon and took off when Danielle informed him that she had contacted the police about the matter. His refusal to answer

and subsequent flight could reasonably be construed as reflecting a consciousness of guilt. This evidence weighed against granting the motion for summary disposition.

AC-MS ultimately relied on (1) the information in the traffic crash report describing a white Ford pickup truck as the hit-and-run vehicle, (2) Fetzer's unequivocal denials that he was involved in the accident, (3) the opinion of the accident reconstructionist that the damage to the Yukon was not consistent with the nature of the accident and the damage to the motorcycle, as revealed by the photographs of the motorcycle and Yukon, (4) the evidence indicating that the scuffmarks were black and not blue, and (5) the evidence that the scuffmarks were on the driver's side of the Yukon's front bumper yet it was the passenger side of the hit-and-run vehicle that struck the motorcycle.

With respect to the description of a white Ford pickup truck with a white topper or bed cap, we have reviewed the photographs of Fetzer's GMC Yukon Denali, and we can easily see how one could confuse the vehicle with a truck with a topper, especially considering that the accident happened at night and evolved quickly. Further, the crash report did not identify the person or persons who provided the information to Officer Coe about a Ford pickup truck, nor did the report provide any information regarding the certainty of the witnesses, the ability of them to see the hit-and-run vehicle, and the length of time that they had to observe the vehicle. Moreover, plaintiff testified that it may have been a Yukon that hit him. While plaintiff's testimony may have been influenced by his sister, the credibility of his testimony and the weight to give the testimony are for a jury to assess.

With respect to Fetzer's denials of any involvement in the accident, his credibility must be evaluated by the trier of fact in light of the inconsistencies and other troubling aspects relative to his deposition testimony. In regard to the accident reconstructionist's opinion, we note some concerns with his view that the slight-in-severity damage to the Yukon was not consistent with the extensive damage to the motorcycle. First, in viewing the photographs of the damage to the Yukon, which the reconstructionist relied on, we have difficulty understanding how or if he assessed the depth and extent of any dents underneath the scuffmarks. Also, plaintiff's account of the accident and his evasive maneuvers, along with the reconstructionist's observation that the scuffmarks traveled "in a front to rear direction," seemed to suggest that it may have been more of a glancing blow when the motor vehicle struck the motorcycle. Finally, the reconstructionist did not appear to consider that the damage to the motorcycle could be attributed, at least in part, to how and where it landed, which included hitting a curb, and not solely the contact between the motorcycle and the hit-and-run vehicle. The analysis or reasoning set forth by the accident reconstructionist was fairly cursory.

Regardless of these concerns, the fact that the Yukon did indeed have damage to the rounded corner of the front bumper on the driver's side of the vehicle, when considered in conjunction with Fetzer's deposition testimony and behavior when confronted by Danielle, supplied adequate evidence to create an issue of fact regarding whether the Yukon was involved in the accident. AC-MS claims, correctly so, that the 911 event chronology provided that the hit-and-run vehicle should have damage to the right or passenger side of the vehicle. But contrary to that evidence, plaintiff testified that the front driver's-side of the motor vehicle struck his motorcycle, thereby creating an issue of fact on that matter. With respect to whether there was any blue paint transference on the Yukon, the scuffmarks look to be black, but we cannot say that definitively. And as mentioned earlier, one of the photographs of the Yukon appears to show some

blue markings. More importantly, Danielle testified that she observed blue paint on the Yukon, and it is for a jury to assess her credibility and weigh the evidence. When *all* of the documentary evidence is considered, and considered in a light most favorable to Progressive, we conclude that the evidence established a genuine issue of material fact regarding whether the Yukon hit the motorcycle on July 4, 2016. Therefore, the trial court erred by granting the motion for summary disposition.

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. Having fully prevailed on appeal, Progressive may tax costs under MCR 7.219.

/s/ Anica Letica
/s/ Jane E. Markey
/s/ Colleen A. O'Brien